# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### CENTRAL DIVISION
### AT LEXINGTON

**CIVIL ACTION NO. 5:12-CV-332-KKC**

**CHRISTOPHER S. GAMBLE**                                                    **PLAINTIFF**

**v.**                          **MEMORANDUM OPINION AND ORDER**

**TIMOTHY W. PEAVYHOUSE, ET AL.**                          **DEFENDANTS**

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff, Christopher S. Gamble, claims that Defendants assaulted him in violation of his constitutional protections from cruel and unusual punishment under the Eighth Amendment. This case is presently before the Court on Defendants' Motion for Summary Judgment (R. 20).[1] Plaintiff, proceeding *pro se,* has filed a Response to Defendants' Motion. (R. 23). Defendants have chosen not to file a Reply to Plaintiff's Response, and briefing is therefore complete. For the reasons explained below, Defendants' Motion for Summary Judgment will be **denied.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On September 6, 2012, Plaintiff Christopher S. Gamble was an inmate confined at Northpoint Training Center ("Northpoint") in Burgin, Kentucky. (R. 1, at 1; R. 5, at 1). At all times relevant hereto, Defendants Timothy Peavyhouse, S.R. Taylor, and Robert Humfleet were corrections officers at Northpoint. It is undisputed that on the morning of September 6, 2012,

---

[1]Defendants' Motion is actually one for partial summary judgment, as it does not challenge the merits of all of Plaintiff's claims. Although Defendants' Motion concludes by asking that the Court "dismiss the Plaintiff's action" (R. 20, at 6), Defendants' Motion is directed solely to Plaintiff's Eighth Amendment claim. As the Court has previously noted, Gamble contends Defendants' actions violated not only his Eighth Amendment right, but also his right under the Fourteenth Amendment to due process of law as well as unidentified provisions of Kentucky law. (*See* R. 16, at 2). Defendants have not addressed Plaintiff's other contentions in their summary judgment motion.

Gamble had an altercation with officers Peavyhouse and Taylor, followed shortly thereafter by a separate altercation with officer Humfleet and an officer John Phillips, who is not named as a defendant in this action. It is the alleged excessive use of force by these Defendant officers – what Gamble describes as unprovoked assaults on his person – that gives rise to this lawsuit.

According to the record, each side's version of the facts of the assaults diverge greatly.[2] Since this is the only information outside of the pleadings that has been offered, and the account of events differs so, the first-hand descriptions become important. As to the first altercation, officer Peavyhouse stated in a Northpoint Training Center Information Report[3] he prepared on September 6, 2012:

> On the above date and time myself & Sgt Taylor went into the upper right wing of Dorm 6 getting I/m's out of their bed areas into the middle of the wings for a shakedown. The above I/m [Gamble] was walking down the wing to sit down being beligerent with staff. I walked down there and told him to be quiet and go sit down and so did Sgt. Taylor. When Sgt Taylor told him again he turned around. Myself and Taylor stopped with him at the big gameroom and told him again. He turned again. Myself and Sgt Taylor placed him on the wall. He began to push off the wall and tried to turn around again. Sgt Taylor placed the I/m in handcuffs. While we were taking the I/m off the wing he tried to headbutt myself and Sgt Taylor. He was taken downstairs and the snatch and grab team came and got him and escorted him to SMU.

---

[2]The factual account of events is placed in the record through two sources. Plaintiff attached materials to his Complaint, and Defendants attached materials to their Response to an earlier-filed summary judgment motion by Gamble. In these attachments, both sides have provided the Kentucky Department of Corrections Disciplinary Report forms completed by the officers along with Gamble's appeal of the Adjustment Officer's Findings on the institutional charges arising from those Disciplinary Reports. (R. 1-2, 15-2). Gamble has also attached the two Department of Corrections Inmate Grievance forms he filed (R. 1-1), as well as his open records request for a copy of the photograph of his injuries and Northpoint's letter response (R. 1-3). Defendants have also attached the Northpoint Training Center Information Reports that were completed by those staff with information about the September 6, 2012, altercations. (R. 15-3).

[3]The purpose and use of these institution specific Northpoint Information Reports is not entirely clear from the record. The forms direct the reporting officer to "DESCRIBE the occurrence in detail (include such items as who, what, when and where)" and the officer's description is reviewed by a supervisor, with his/her comments and actions noted. Defendants do not explain to what extent these Information Reports are used in conjunction with Policy No. 15.6 of the Kentucky Corrections Policies and Procedures (CPP), covering the subject matter of Adjustment Procedures and Programs, which concerns disciplinary charges brought against inmates. CPP 15.6 can be found on the Kentucky Department of Corrections website, http://corrections.ky.gov.

(R. 15-3, at 1). Peavyhouse's coworker, officer Taylor, also completed a Northpoint Information Report for this first incident, upon which he stated:

> On the above date and approximate time I SGT Taylor was Tasked and deployed in a state wide C.E.R.T. shakedown of North Point Training Center. I was tasked to shakedown Dormitory 6 Upper Left Side. Upon entering the dormitory I held the door for the other institution's as they made a fast shuffle to there target area. After that I resumed to my area and found that my team members have already secured the area and inmates in the center of the floor and all but one was compliant. As I came to the two man room I herd Officer Joe Thomas #475 trying to move Inmate Christopher Gamble # 213166. Inmate Gamble stated that this was not serious and made it a point to move at his time and speed. Furthermore as we tried to get Inmate Gamble to the secure area he turned to his right and faced me and began too use aggressive language and took a offensive stance. At that time simultaneously Inmate Gamble was restrained by myself and Officer Thomas and cuffed by SGT Peavyhouse. Inmate Gamble was being escorted to the lower foyer and began to fight and stated he was not going and locked his legs. The commander of the dorm asked me was I hit due to he said he was trying to head but me. I was unaware of that action due to I was trying to watch the inmates legs and prevent him from kicking me. Inmate Gamble continued to resist till we got to the lower foyer where he was picked up by a the Snatch And Grab Team.

(R. 15-3, at 2). There were also Northpoint Information Reports completed regarding the second incident. Officer Humfleet reported on September 6, 2012, that

> [o]n the above date and approx time and location CERT members Mann and Hess from Marion County brought Inmate Gamble into SMU. When I/m Gamble came in he started mouthing, arguing, and not being compliant. I/m stated he had blood in his mouth, he needed a nurse. I/m was argumentative the entire time we was strip searching him. He turned and spit blood into the sink. After I told him not to. I/m Gamble was placed in the inside visiting room until we had a cell ready. I was advised he was placed on MAS status. I brought I/m Gamble out, put leg restraints on him and advised him he was on MAS status. Anytime he was moved within the unit he will have cuffs and shackles on. Nurse Sowders was ready to check him out so we brought him out and while he was being checked out he became disruptive, and argumentative, so myself and Officer John Phillips removed him from the area and placed him back in the inside visitation room. He was placed on the floor face down after he tried to spit at us. There was a few blood spots in the visiting room where he had spit. After about 15 min. to 20 min. I took I/m Gamble along with Officer Hoeck and placed I/m in cell 409. I/m was still being argumentative and disruptive.

(R. 15-3, at 6).   Humfleet's coworker, officer Phillips, also completed the following Northpoint

Informational Report on September 6, 2012:

> On the above date approximate time I was called to SMU to help with pill call.
> When I got there nurse Sanders was evaluating inmate Gamble. He became very
> argumentative and aggressive toward us. Myself an LT Humfleet was removing
> him from the table and he began to spit blood at us. Myself an LT Humfleet place
> him in the floor in the visiting room until he calmed down and quit spitting.   We
> then left the room and shut the door to let him calm down.

(R. 15-3, at 3).   There were also Northpoint Information Reports completed by a member of the

medical staff, LPN Sowders, who was present at the time and tending to Plaintiff Gamble.

> On 9-6-12 at approximately 9:30 am while doing pill call in SMU Inmate C.
> Gamble #213166 was checked for injuries after being brought straight in by the
> CERT Team. Upon assessment inmate was noted to have the following injuries:
> 1) abrassion on left forehead 2) loose upper left back tooth. Inmate became
> verbally aggressive with staff and unable to complete assessment. Inmate was
> placed in visiting room and was spitting blood at security staff. Inmate on max
> status due to combative behavior.

(R. 15-3, at 5).   LPN Sowders also filled out an Information Report for her physical check of

Officers Humfleet and Phillips.

> On 9-6-12 at approximately 9:30 am inmate C. Gamble #213166 became
> aggressive with staff spitting blood. Lt. Humfleet #213 and c/o J. Phillips #489
> escorted inmate into visiting room in SMU. Upon assessment Lt. Humfleet and
> c/o Phillips had no apparent injuries at this time.

(R. 15-3, at 4).

On September 10, 2012, before any formal Disciplinary Reports were completed by the

involved officers, Gamble completed two Department of Corrections Inmate Grievance

Information Forms, one for each encounter, noting that the subject matter of the grievance was a

conflict with staff.   (R. 1-1, at 1-4). Policy No. 14.6 of the Kentucky Corrections Policies and

Procedures governs Inmate Grievance Procedures.[4] Gamble's completed Inmate Grievance Forms contain the following as the Brief Statement of the Problem:

> I was physically/criminally assaulted by a team of staff members led by Sgt. S.R. Taylor. This action was caught on tape, and the footage serves to prove that I, myself, initiated no form of threatening behavior (be it verbal or physical) and was therefore a victim of excessive brute force and official misconduct at the hands of northpoint staff. I received physical injury from this (bloody mouth, large knot on head) and suffered the worst part of the abuse while bound with handcuffs behind my back, making this a criminal act. Staff had no reason to ensue such harsh measures because I was passive and non-violent to begin with.

(R. 1-1, at 2).

> I was physically assaulted by seg officer Lt. Humfleet and an accomplice whose name is unavailable. After being assaulted by another group of staff, I was escorted to seg barefooted and forced to walk across rocks and other painful debris. Upon reaching seg I was visibly upset, with blood around my mouth. And while being handcuffed behind my back I was making passive comments, never threatening or indicating violence, but during my medical examination I was complaining about my mistreatment when Humfleet forcefully ripped me up from my seat and dragged me to the visitation room and slammed me into the wall and onto the tiles, threatening to "break every bone in my body."

(R. 1-1, at 4). Gamble requested these grievance reports be sent to the Warden and Commissioner of the Department of Corrections, an internal affairs investigation be undertaken, appropriate legal measures taken against the staff involved, and that any and all disciplinary actions pursued against him be dismissed. (R. 1-1, at 2, 4).

Subsequently, on September 14, 2012, officer Peavyhouse completed a Kentucky Department of Corrections Disciplinary Report Form Write-Up on the first altercation, using the description he had provided in his prior Northpoint Information Report quoted above. (R. 1-2, at 1; R. 15-2, at 1). Gamble was charged with taking physical action against an employee or non-inmate, a major category 7-1 offense. (*Id.*). This same date, officer Humfleet also completed

---

[4]CPP 14.6, like CPP 15.6 noted above at footnote 3, can be found on the Kentucky Department of Corrections website.

a Department of Corrections Disciplinary Report Form Write-Up for the second altercation, for which Gamble was charged with creating or causing a health hazard, a major category 6-11 offense. (R. 1-2, at 6; R. 15-1, at 1).

Disciplinary Reports are addressed per Policy No. 15.6 of the Kentucky Corrections Policies and Procedures, Adjustment Procedures and Programs. Both Write-Ups were assigned to Investigating Officer Andrew Epperson. Epperson subsequently reported that Gamble, upon being read the first report, stated "It was all captured on camera and that's a lie" (R. 1-2, at 1; R. 15-2, at 1) and upon being read the second report, stated "That's a lie and I was assaulted by those officers." (R. 1-2, at 6; R. 15-1, at 1). On September 16, 2012, Epperson referred both Disciplinary Reports to the Adjustment Committee, to be heard by a hearing officer upon Gamble's waiver of an Adjustment Committee hearing.

Meanwhile, as to the Inmate Grievance Forms completed by Gamble, it appears that grievance aide James Riggs became involved, as the Forms reflect he signed them on September 17, 2012. (R. 1-1, at 2, 4). However, both Grievances then contain a September 19, 2012, notation by staff member Michelle Bonta that "Disciplinary actions are non-grievable per CPP 14.6, Inmate Grievance Procedure. However, I will pass this information on to the appropriate staff." (*Id.*; R. 1-1, at 1, 3). The last notation on the Grievances is a September 20, 2012, signature by the grievance aide of being informed of the above staff member determination. (R. 1-1, at 2, 4).

On September 24, 2012, consecutive hearings were held on the two disciplinary charges brought against Gamble. According to the Disciplinary Report Form Part II, Gamble was present with his legal aide and requested the camera footage of the incident be viewed. The footage,

however, was "denied due to safety and security of the institution." (R. 1-2, at 2; R. 15-2, at 3).

Under Findings, the Adjustment Officer stated as follows:

> Inmate Stated that he was going into the foyer and inmate and Sgt. Taylor stated that he was going into the foyer and Sgt Taylor came up behind him and started yelling move, move, move, and that he stated that Sgt. Taylor said move buddy are you death, and inmate stated he turned and looked at Sgt. Taylor that he isn't his buddy and Sgt. Taylor was yelling and spit was coming out of his mouth hitting him in the face. Inmate stated he slammed to the ground, and That he was carried from the area. Inmate Stated at the time on the write up that states he was trying to headbutt Sgt. Peavyhouse and Sgt Taylor it was impossible due to him begin carried and his arms so far above him that he couldn't. Inmate Legal aide stated that no staff was harmed so how could it be physical action against an employee it was more resisting.

(*Id.*).   Ultimately, the Adjustment Officer found Gamble guilty of this charge, after concluding Gamble had attempted to head butt Defendants Taylor and Peavyhouse while they were taking him off the wing. (*Id.*). Gamble was sentenced to 18 days in disciplinary segregation and lost 393 days of good-time credit. (R. 1-2, at 5; R. 15-2, at 4).

As to the second charge of creating or causing a health hazard for spitting blood, the Disciplinary Report Form, Part II Findings section states,

> Inmate requested camera footage as a witness and plead not guilty. Inmate stated that he substained injuries due to another insident with officers. Inmate stated that he was never told not to spit in the sink, and then went on to say that the he was being checked by medical and he was venting his anger and then out of nowhere inmate stated that he was ripped out of the seat and taken to the visiting room and they slammed him to the floor again. Inmate stated that Lt. Humfleet and C/O Phillips reports are not consistant, and if he did try to spit blood on them why is there no picture or anything like. Inmate legal aide brought up about reports need to be clean consise and consistant, and stated that if inmate did spit blood in the sink then it could be washed down with water so it couldn't be a health hazard.

(R. 1-2, at 7; R. 15-1, at 3).   The Adjustment Officer found Gamble guilty of an amended charge of 3-02, refusing or failing to obey an order, based on Gamble spitting blood into the sink after

being instructed not to by Defendant Humfleet. (*Id.*). Gamble was sentenced to 15 days in disciplinary segregation for this offense. (R. 1-2, at 9; R. 15-1, at 3).

Gamble appealed both of these decisions to the Warden. He asked that the Warden review the camera footage that was denied to him, noted that the officers had failed to describe in detail the exact happenings of the incident, and that his injuries were documented by photograph. He expressed his belief he was convicted of disciplinary charges to cover up the assault committed on him by the officers. (R. 1-2, at 3-4, 8; R. 15-1, at 5; R. 15-2, at 5-7). The Warden on October 19, 2012, denied both appeals, reasoning for each that "The due process requirements appear to be in order. The evidence is sufficient in order to establish a finding of guilt. The Adjustment Committee's decision will stand. Your appeal has been denied." (R. 1-2, at 5, 9; R. 15-1, at 4; R. 15-2, at 4). CPP 15.6, Section II.F.7. does not permit an appeal to be taken beyond the Warden's decision.

Thereafter, on October 24, 2012, the Northpoint Training Center Records Department received a request from Gamble for a copy of a digital photo taken on September 6, 2012, of his face, which photo he believes would show the "huge knot and swelling of his face." (R. 1-3, at 1). An October 30, 2012, letter to Gamble from an Information Specialist at Northpoint responded that "the document you have requested has been identified as a security threat" and that "the Department will not provide a copy of a photograph that could be used to fabricate identification, facilitate escape, or other uses that may constitute a threat to institutional security." (*Id.* at 3).

Gamble filed his *pro se* §1983 Complaint on November 1, 2012, asserting Eighth Amendment excessive force claims, a Fourteenth Amendment due process claim, and

unspecified state law claims.  (*See* R. 1).  When asked on the Complaint form to state the facts of his case in support of his statement of claim, "[e]xplain[ing] specifically what each Defendant did or failed to do," Gamble offered the following factual allegations, signed under penalty of perjury:

    1.   I was physically/criminally assaulted by S.R. Taylor and Timothy Peavyhouse. These officers were in no way obligated to enact physical force upon me and broke the law and the Code of the institution. I was never violent or threatening in any way, never touched anyone, was never out of control, and still I was taken down with brute force and handcuffed very violently while both of the above-named officers drove elbows and knees into my entire body. I was picked up and carried off the wing with my arms twisted out of joint, above my head, and upon reaching the bottom of a flight of steps I was again slammed into a wall, picked up and slammed into the tiles once again. While being pinned to the tiles by the same method of knees and elbows being driven and grinded into my body, and handcuffed behind my back, I began moving my head around and was met by a palm thrust from sergeant S.R. Taylor, as he violently slammed my face/skull back down into the tiles, knocking my tooth loose, cutting me on the inside of my mouth and raising a golf-ball sized contusion on my forehead.   I was then ripped up and carried outside, and forced to walk barefoot across the entire yard, stepping over various sharp and pointed debris.

    2.   Officers Robert G. Humfleet and an Officer named Phillips (first name unknown) again assaulted me immediately after the first assault, this time in the segregation unit of the prison.  I arrived at the unit with a bloody mouth and swollen face, and during my strip search I was dazed and dizzy after almost being knocked unconscious by S.R. Taylor, and was spitting blood from my mouth into a sink. I began complaining about the mistreatment and abuse I had just suffered at the hands of staff, and Humfleet threatened me in the manner of "you need to shut the hell up or else you will get it again." I made another comment, while being examined by medical staff and being bound behind my back, never being violent or agressive in any manner and then I was ripped up from my seated position and dragged about twenty feet from the area into a "visitation" area on the far side of the corridor. Officers Humfleet and Phillips slammed me into the wall and then ripped me by my handcuffed arms down to the tiles, began applying tremendous pressure to my wrists and forearms, twisting my arms, and again driving the points of their knees into my spine and shoulder blades, constricting my breathing. Robert G. Humfleet then used his palm to grind my face and skull into the tiles, while making threats consisting of "you shut your mouth you little piece of garbage or we'll break every bone in your body." These actions worsened

my previous injuries and were illegal because I was bound behind my back and not causing a threat.

(R. 1, at 2-4). The Complaint goes on to allege that the officers then submitted false documents with fabricated accounts of the incidents, with Peavyhouse accusing Gamble of "attempting to headbutt him" to try and justify his own wrongdoing, and with Humfleet and Phillips both falsely accusing him of "spitting blood at them" in violation of state law, Department of Corrections Policies and Procedures, and his constitutional rights. (*Id.* at 4-5).

Upon filing of his Complaint, the Court conducted a preliminary review pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A. (R. 5, at 1). After preliminary review, Gamble's claims against Warden Bottom were dismissed. (*Id.* at 5). On January 11, 2013, the remaining Defendants filed an Answer. (R. 9). In their Answer, Defendants denied "that any of their actions were inappropriate while constraining an unruly inmate" or "that any of their actions towards the Plaintiff resulted in a constitutional violation and any violation of law." (*Id.* at 2).

Gamble on March 21, 2013, sent a supplement to the clerk for filing (R. 11), noting therein that he had been further assaulted by officers, had been placed in segregation, and felt unsafe at Northpoint due to what he believed were retaliatory actions by officials after filing his lawsuit. In his supplement Gamble requested a transfer; however, any consideration of that request was rendered moot after Gamble filed a notice of change of address the following month, reporting that he had been transferred. (*See* R. 14).

A case schedule was entered. (R. 17). Following the expiration of the discovery period, Defendants then filed the Motion for Summary Judgment that is presently before the Court. (R. 20).

## II.    LEGAL STANDARD

Under the federal rules, summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c). The burden is initially on the moving party to inform "the district court of the basis of its motion, and identify[ ] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of a material fact.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The moving party may make this showing by demonstrating the absence of evidence to support one of the essential elements of the nonmoving party's claim.   *Id.* at 322-25.

Once the moving party's burden is met, the nonmoving party, "must set forth specific facts showing that there is a genuine issue for trial."   Fed. R. Civ. P. 56. The nonmoving party, however, must provide more than a "mere scintilla of evidence"; there must be sufficient evidence on which the jury could reasonably find for the nonmoving party.   *Dominguez v. Corr. Med. Servs.,* 555 F.3d 543, 549 (6th Cir. 2009).

A court's function is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Barr v. Lafon,* 538 F.3d 554, 561 (6th Cir. 2008) (*quoting Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)). A fact's materiality is determined by the substantive law, and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue for trial, all evidence must be viewed in the light most favorable to the nonmoving party. *Barr,* 538 F.3d at 561. Ultimately, whether summary judgment is appropriate is determined by "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Anderson,* 477 U.S. at 251-52; *Harrison v. Ash,* 539 F.3d 510, 516 (6th Cir. 2008).

With this standard in mind, the Court turns to consideration of the merits of Defendants' Motion.

## III. ANALYSIS

Defendants' legal argument in support of summary judgment is fairly straightforward. Aside from incorporating by reference the arguments Defendants made in response to Gamble's earlier-filed summary judgment motion,[5] Defendants argue simply that "Plaintiff has produced no probative evidence demonstrating that the Defendants lacked a legitimate explanation for their use of force upon Plaintiff or otherwise failed to act in good faith." Pointing to the two Disciplinary Write-Ups by the officers and the disciplinary adjustment process, Defendants maintain "Plaintiff was being uncooperative [in] being removed from his cell. During the altercation he attempted to head butt an officer. At his disciplinary hearing, the Plaintiff's legal aid admitted that the actions [were] at least "resisting." Therefore, even if the Plaintiff was in fact "slammed" down, this action would have been appropriate under the circumstances. This reasoning holds equally true when the Plaintiff was spitting blood after being told not to do so. The Plaintiff is unable to show that the force used was not in accordance with professional

---

[5]Gamble filed a Motion for Summary Judgment on March 30, 2013, arguing that there were no genuine issues of material fact and he was entitled to judgment as a matter of law. (*See* R. 10). Defendants filed a Response. (*See* R. 15). In that Response, Defendants pointed out that "Plaintiff admits that there is a genuine issue of fact when he states that '[a]ny "attempted head butting" as alleged by Peavyhouse and Taylor never happened.'" (R. 15, at 5). In other words, Defendants acknowledged that Gamble's disagreement with officers Peavyhouse and Taylor's assertions that he attempted to head butt them constitutes a genuine issue of material fact in determining whether the officers' conduct was an unprovoked assault or a reasonable response to what Defendants assert was a combative inmate. Defendants understand that these factual issues exist in this case and are for a jury's determination. For Defendants to now succeed with their own summary judgment they would have to show there is no longer a fact question about this for a jury. Despite the arguments they now make, which are considered herein, they simply have not shown that fact questions no longer exist.

standards for restraining a combative inmate." (R. 20, at 5).[6]   While the Court appreciates a straightforward argument, it is, nevertheless, oversimplified. Defendants fail to view the facts in the light most favorable to Plaintiff as the nonmoving party, or to persuasively show how Defendants would be entitled to a summary judgment if the applicable legal standard were applied to this view of the facts. As explained below, Defendants' motion must therefore be denied.

### A.    The Eighth Amendment

The Eighth Amendment protects prisoners from cruel and unusual punishment imposed by "the unnecessary and wanton infliction of pain."   *Hudson v. McMillian,* 503 U.S. 1, 5 (1992). Yet, in the maintenance of prison security and discipline, inmates may be subjected to physical contact that would be actionable as assault under common law. *Combs v. Wilkinson,* 315 F.3d 548, 556 (6th Cir. 2002). "To determine whether a claim of assault rises to a level of constitutional magnitude, a court must consider the reasons or motivation for the conduct, the type of force used, and the extent of the inflicted injury."   *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993).

As the Sixth Circuit recently explained, whether force used by officials is excessive in violation of the Eighth Amendment has both an objective and subjective component. *Cordell v. McKinney*, __ F.3d __, No. 13-4203, 2014 WL 3455556, at *5 (6th Cir. July 16, 2014). Objectively, the pain inflicted by the prison official must be "sufficiently serious" to offend "contemporary standards of decency." *Williams v. Curtin,* 631 F.3d 380, 383 (6th Cir. 2011).

---

[6]Plaintiff questions the credibility, but not the authenticity, of the Informational Reports and Disciplinary Write-Ups of the Defendants.  Gamble's Complaint also challenges Defendants' compliance with the Department of Corrections policies and procedures for these disciplinary reports.  Gamble looks to these same disciplinary-related documents to present his claims, along with the Grievances that he filed.  Thus, both parties appear to treat these attachments to filings as materials in the record, not subject to objection, under Civil Rule 56(c)(1)(A), and they will therefore be considered by the Court.

The subjective component looks to the state of mind of the prison official. *Moore v. Holbrook,* 2 F.3d at 700. The question "ultimately turns on 'whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Id.* (*quoting Whitley,* 475 U.S. at 321). To answer the question of the prison official's state of mind, the Supreme Court in *Hudson v. McMillian* explained that

> the extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur. In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officers, and any efforts made to temper the severity of a forceful response.

*Hudson*, 503 U.S. at 7 (citation omitted) (internal quotation marks omitted). For it is "[f]rom such considerations [that] inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley,* 475 U.S. at 321.

### B. The Subjective Component

In *Cordell,* the Sixth Circuit reinforced the current application of these standards from *Whitley* and *Hudson* for analyzing whether defendant officials had a culpable state of mind. Courts are to consider "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted," as well as "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the

severity of a forceful response." *Cordell,* 2014 WL 3455556, at *6 (*quoting Whitley,* 475 U.S. at 321).

### 1.       The need for the application of force

In this case, whether there was a need for the Defendant officers to use force with Gamble depends upon what Gamble's actions were during the relevant time period. To support their request for summary judgment, Defendants argue that the facts concerning Gamble's behavior and whether force was necessary were previously determined at Gamble's disciplinary proceedings; namely, that Gamble "attempted to head butt one of the officers" and "spit blood." Defendants maintain these factual findings have preclusive effect and entitled Defendants to use force in response, and therefore their actions could not be considered malicious or wanton as a matter of law. (R. 20, at 4).   However, as discussed below, the prior disciplinary findings likely have no preclusive effect, and therefore there would be a jury question on whether Gamble did attempt to head butt and/or spit blood. Moreover, even if the factual findings were binding, there would still be jury questions over whether the force used by Defendant officers in response was appropriate or crossed the line, suggesting maliciousness.

The adjustment officer at Gamble's disciplinary hearings found that Gamble did in fact attempt to head butt one of the officers and did spit blood into the sink against orders. (*Id.*). In support of their position, Defendants cite to *Peterson v. Johnson*, 714 F.3d 905 (6th Cir. 2013). Defendants' argument for preclusion in this case consists of one sentence: "When a state agency, acting in a judicial capacity, resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the States's courts." (R. 20, at 4). It

appears Defendants assume that the adjustment officer's findings of fact at Gamble's disciplinary proceedings meet the criteria established by *Elliott* and applied by the Sixth Circuit in *Peterson*.

The issue before the Sixth Circuit in *Peterson* was whether a disputed issue of fact resolved at a Michigan "major misconduct hearing" was entitled to preclusive effect in collateral litigation brought by the prisoner under 42 U.S.C. § 1983. *Peterson*, 714 F.3d at 908. In resolving that issue, the Sixth Circuit applied four criteria outlined by the Supreme Court in *University of Tennessee v. Elliott*, 478 U.S. 788 (1986). *Id*. at 912. *Elliott* dictates that federal courts must give a finding of fact by a state administrative agency the same preclusive effect to which it would be entitled in the state court if: the state agency were acting in a judicial capacity; the state agency resolved a disputed issue of fact properly before it; and the parties had an adequate opportunity to litigate. *Elliott*, 478 U.S. at 799 (*quoting Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966)). If these three criteria are met, then the fourth criterion of *Elliott* directs the federal court to give the agency's finding of fact the same preclusive effect to which it would be entitled in state court. *Id*.; *Peterson*, 714 F.3d at 913.

First, "an administrative agency 'acts in a judicial capacity when it hears evidence, gives the parties an opportunity to brief and argue their version of the facts, and [gives the parties] an opportunity to seek court review of any adverse findings.'" *Peterson*, 714 F.3d at 912 (quoting *Herrera v. Churchill McGee, LLC*, 680 F.3d 539, 547 (6th Cir. 2012)). In *Peterson*, the court held that the hearing officer at the Michigan major misconduct hearing was acting in a judicial capacity, noting "there is a whole raft of judicial-type protections available to Michigan prisoners in major misconduct hearings."[7] *Id*.

---

[7]The Sixth Circuit noted that under Michigan law,

On the limited record before this Court, it is unclear whether the adjustment officer at Gamble's disciplinary hearings was acting in a judicial capacity. Prisoner disciplinary hearings in Kentucky are governed by the Department of Corrections Policies and Procedures.[8] A review of the Kentucky Department of Corrections procedures for disciplinary hearings reveals that there are key differences between disciplinary hearings in Kentucky and major misconduct hearings in Michigan. For example, in Michigan the presiding officer is an attorney and must be impartial. *Peterson*, 714 F.3d at 912. But in Kentucky, the adjustment officer is appointed by the warden and is a staff member at the supervisory level. 501 Ky. Admin. Reg. 6:020; CPP 15.6.[9] At a Michigan major misconduct hearing, the prisoner has an opportunity to present evidence, present oral and written arguments on issues of fact, and present rebuttal evidence. *Peterson*, 714 F.3d at 912. At a disciplinary hearing in Kentucky, the prisoner is only entitled to make a statement, present documentary evidence, and call a witness so long as it is not unduly hazardous to

---

[t]he accused prisoner must receive an evidentiary hearing without undue delay, be given reasonable notice of the hearing, receive an opportunity to present evidence and to present oral and written arguments on issues of fact, and be allowed to submit rebuttal evidence to the evidence against him. Further, the evidence at the hearing may be admitted only on essentially the same evidentiary standard used for all Michigan administrative hearings; any objections to the evidence's admissibility must be resolved and explained on the record; and all admitted evidence must be made part of the record. Further, the presiding officer must be an attorney, can administer an oath or affirmation to a witness and take depositions as a part of his fact-finding role, must be impartial and must recuse if the accused files a motion successfully showing bias, must abstain from ex parte communications with the accused prisoner and the accusing Department of Corrections staff, and must make an official record at the hearing at which he presides. The hearing officer must conclude the process by issuing a written final decision that is based solely on the preponderance of the evidence in the record, and that decision must be immediately mailed to the accused prisoner. And if the prisoner disagrees with that final decision, he has a right to appeal it within the agency and then, if still displeased, to state court.

*Peterson*, 714 F.3d at 912-13 (citations omitted) (internal quotations marks omitted).

[8]The Department of Corrections is charged with "promulgat[ing] administrative regulations for the government and discipline of the penitentiary," K.R.S. § 197.020(1)(a), and the Kentucky Administrative Regulations provide for the development of a policy and procedures manual to be adopted pursuant to this authority and filed with the Department of Corrections. 501 Ky. Admin. Reg. 3:020.

[9]The regulation incorporates Kentucky Department of Corrections Policies and Procedures by reference. 501 Ky. Admin. Regs. 6:020. As previously noted, the Policies and Procedures are available in full text on the Kentucky Department of Corrections website, http://corrections.ky.gov.

institutional safety. 501 Ky. Admin. Reg. 6:020; CPP 15.6. In Michigan, the hearing officer issues a written final decision based on a preponderance of the evidence, and the prisoner has a right to appeal within the agency and then to state court. *Peterson*, 714 F.3d at 912. In Kentucky, the adjustment officer does prepare a written report and the prisoner can appeal to the warden, but an appeal may not be taken beyond the warden, whether within the agency or to a state court. 501 Ky. Admin. Reg. 6:020; CPP 15.6. Given these differences in procedure for prison disciplinary hearings, it does not appear that the adjustment officer at Gamble's disciplinary hearings was acting in a judicial capacity. Moreover, Defendants have not identified an instance where an adjustment officer at a prison disciplinary hearing in Kentucky has been found to be acting in a judicial capacity.

Second, under *Elliott* the administrative agency must have resolved a disputed issue of fact that was "properly" before it. *Peterson*, 714 F.3d at 913. As noted above, Defendants seek to preclude further fact-finding on two disputed facts, whether Gamble attempted to head butt correction officers and whether Gamble spit blood into a sink after being instructed not to by correction officers. (R. 15, at 4). At his disciplinary hearings Gamble disputed both of these facts. (R. 1-2, at 2, 7). The adjustment officer found Gamble guilty of physical action against an employee or non-inmate for attempting to head butt Defendants Taylor and Peavyhouse (*id*. at 2), and guilty of refusing or failing to obey an order when he spit blood into the sink against orders from Defendant Humfleet (*id*. at 9). The adjustment officer rejected Gamble's account of the events and his findings were necessary to his ultimate ruling that Gamble was guilty of the two offenses. Thus, the second *Elliott* criterion is likely satisfied in this case. *See Peterson*, 714 F.3d at 913 (finding that the hearing officer resolved a disputed issue of fact properly before him when

he rejected the plaintiff's factual account as a necessary predicate to his ultimate determination that the plaintiff had committed an assault and battery).

Third, Gamble must have had an adequate opportunity to litigate the factual dispute. *Peterson*, 714 F.3d at 913. In *Peterson*, the Sixth Circuit found that the plaintiff had an adequate opportunity to litigate where he exercised a "plethora of statutory protections" and his objections to the hearing officer's determinations could have been appealed within the department, then to state court. *Id*. In this case, Gamble's opportunity to litigate appears to be more limited. The Disciplinary Report Forms, Part II from Gamble's hearings do not identify whether he was able to call witnesses and question the accusing officers.[10]   At hearing Gamble requested a review of the camera footage from the incidents, but his request was denied due to security concerns. (R. 1-2, at 2).   The written decisions do not state whether the adjustment officer viewed the camera footage before making his determination.[11]   Also, Gamble was unable to appeal the decision further than the Warden. Thus, Gamble's opportunity to litigate the factual findings in question was more limited than that available under Michigan law and utilized in *Peterson,* and therefore it does not appear that Gamble's disciplinary factual findings should be given preclusive effect.

If these factual findings are not given preclusive effect, Defendants certainly would not be entitled to summary judgment. As noted above, Gamble disputes that he attempted to head butt

---

[10]CPP 15.6(B)(2) provides that standard procedure is for audio tape recordings of such hearings to be preserved for a period of two years from the date of the warden's review. Defendants have not offered any hearing recordings in support of their preclusive effect argument presented in their motion.

[11]At hearing, the adjustment officer's findings note that Gamble requested the camera footage from the incident but the request was denied for institutional safety and security reasons. The report is silent as to whether the adjustment officer viewed the camera footage himself. Gamble's Response to Defendants' Motion for Summary Judgment identified an issue involving the discovery of the camera footage. In his Response, Gamble states that Defendants refuse to turn over camera footage as he requested in discovery (R. 23, at 4), "and continue to hide from view." (*Id*. at 7). According to Gamble, the camera footage supports his factual allegations. (*Id*.). Defendants did not file a Reply to Gamble's Response and therefore did not address Gamble's assertions regarding the camera footage. The absence of camera footage is not detrimental to Gamble's Eighth Amendment claim on summary judgment. However, this issue may need to be revisited by the Court and resolved at a later stage in litigation prior to trial.

the officers or that he spit blood either directly at officers or against an order not to do so into a sink. And on summary judgment, if these facts are not given preclusive effect, they would be viewed in the light most favorable to Gamble. According to Gamble's version of events, he was not physically or verbally threatening to the officers and was restrained throughout most of the course of the alleged assaults. Gamble also points to what he describes as the lack of evidence of his "combativeness" that Defendants now point to as justifying their use of force against him.[12] According to Gamble, "Any aggressive, violent, force-inducing behavior by Gamble is at best speculatory, seeing as how there is no proof at all that there was any - no witness statements, no marks, bruises, etc., or for that matter, the camera footage, to support the claim by the defendants - which is solely premised upon unfounded accusations in an attempt to cover up two assaults." (R. 23, at 6). In this light, the jury would have to determine whether or not Gamble acted out as Defendants claim he did.

Moreover, at this juncture it is not necessary for the Court to decide whether the adjustment hearing officer's findings of fact are entitled to preclusive effect. Even assuming that Gamble attempted to head butt the officers and spit blood into the sink against orders, his Eighth Amendment claim would still survive summary judgment. This is because there are jury questions about whether the force used by Defendant officers was appropriate under the circumstances, or instead indicative of a malicious intent to cause serious harm. Therefore, even

---

[12]The Information Reports and/or Disciplinary Report Form Write-Ups of officers Peavyhouse and Taylor as to the first incident refer to Gamble as being "belligerent with staff," responding to commands at too slow a pace, and using "aggressive language." They refer to Gamble's physical actions as "turning around" when told to sit down and be quiet; as "pushing off the wall"; "turning around again"; taking an "offensive stance"; "tr[ying] to head butt" Peavyhouse and Taylor as taken off the wing; "began to fight" as being removed "and locked his legs" and "continued to resist." (*See* text at pp. 2-3 herein, quoting said Reports). As to the second incident, officers Humfleet and Phillips refer to Gamble as "mouthing, arguing, and not being compliant"; "very argumentative and aggressive"; "argumentative" during strip search; "turned and spit blood into sink"; again "became disruptive and argumentative"; "tried to spit [blood] at us" in visiting room; "began to spit blood at us as removing him from the [examining] table." (*Id.* at pp. 3-4).

if *Peterson* were applied here, Defendants still have to show there is no reasonable question for the jury that the level of force used by officers to deal with Gamble's conduct was appropriate. Just because a need for force is demonstrated, it is not automatic that what corrections officers do in response is considered appropriate force to maintain or restore discipline. As discussed immediately below, if a question in this respect exists, the issue is for a jury to determine. Here, "fact finding" of head butting and spitting against an order is not dispositive of the level of force question, even were these factual findings to be given preclusive effect.

### 2.    Relationship between the need for and the amount of force used

Defendants correctly note that they are permitted to use force to maintain discipline and order. But they are not permitted to use whatever force they wish. The can use only the amount of force that would be appropriate under the circumstances, the check being it may not be such force that wantonness and maliciousness are suggested under the circumstances.

Defendants argue that the force used on Gamble was appropriate under the circumstances because Gamble attempted to head butt corrections officers and spit blood into a sink against direct orders.   (R. 20, at 5). "Because prison officials must make their decisions in haste, under pressure, and frequently without the luxury of a second chance," a prison official's decision to use force is entitled to deference. *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (*quoting Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir. 2002)). "The issue is not whether the use of force was absolutely necessary in hindsight, but 'whether the use of force could plausibly have been thought necessary. . . .'"   *Id.* (*quoting Whitley*, 475 U.S. at 321).

Defendants seem to be suggesting that an analysis of their specific behavior is not warranted once it is established that use of force with an inmate is needed. Relying upon *Whitley,*

475 U.S. at 320, Defendants maintain that if the use of force "could plausibly have been thought necessary," the actions of the corrections officials do not violate the Eighth Amendment prohibition on cruel and unusual punishment. Citing to *Carlton v. Turner,* 2006 WL 955886, at *3 (6th Cir. 2006), Defendants argue that Gamble's claim is cognizable under the Eighth Amendment only if "the officers provided no legitimate[, good faith] explanation for using force." Defendants say they provided a legitimate, good faith explanation for using force here – that Gamble was being uncooperative in being removed from his cell and attempted to head butt an officer during the altercation, and that Gamble's legal aid during the disciplinary hearing admitted that Gamble's actions were at least "resisting." (R. 20, at 5). They maintain that Gamble has produced no probative evidence demonstrating that they lacked a legitimate explanation for their use of force on him or otherwise failed to act in good faith.

This statement from *Carlton* upon which Defendants rely must, however, be considered in context. There, officers were sued for excessive force after they assaulted plaintiff inmate while he was being interviewed by them over his witnessing of a separate assault upon an inmate by two officers. In denying summary judgment to the officers upon applying the Eighth Amendment standard, the Sixth Circuit pointed out that while courts "will excuse exercises of force 'applied in a good-faith effort to maintain or restore discipline,' the defendant officers here "provided no legitimate explanation for using force" or "any justification for their conduct." *Carlton,* 2006 WL 955886, at *3. Defendants in the instant matter have taken this statement from *Carlton* and turned it on its head: rather than an Eighth Amendment claim being viable because no justification at all for use of force was offered, Defendants are trying to suggest that if a legitimate, good faith justification is offered, there can be no viable Eighth Amendment claim.

However, even where a justification or explanation for using force is offered, the explanation may still be factually disputed between the parties, as could the type and reasonableness of the force that was used. Indeed, Gamble makes these such factual challenges here.

Defendants several times in their memorandum contend that for Gamble to prevail on his claim, he must come forward with "evidence [that] goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives," citing *Whitley,* 475 U.S. at 321. (R. 20, at 5-6). However, this argument by Defendants is also misplaced. This statement from *Whitley* was made by the Court in the context of ruling on a motion for directed verdict after presentation of proof at trial. Although the Supreme Court in its 1992 decision in *Hudson v. McMillian* adopted the standard it had announced in *Whitley* of "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm," as applicable to all officer-upon-inmate use of force circumstances for purposes of an Eighth Amendment claim, it bears pointing out that *Whitley* specifically involved circumstances of a prison riot. The excerpt Defendants quote is from that portion of the decision where the High Court is referring to a trial court

> ruling on a motion for a directed verdict in a case such as this [use of force in a prison riot setting], courts must determine whether the evidence [presented at trial] goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

*Whitley,* 475 U.S. at 322.

Thus, even assuming the use of force against Gamble could plausibly had been thought necessary, the Court must still consider the relationship between the need to use force and the

amount of force used. *Cordell*, 2014 WL 3455556, at *7. The analytical difficulty with Defendants' motion in this case, a difficulty that does not work in their favor, is that their filings and attached documents say very little about what force they actually used. The Information Reports and Disciplinary Write-Ups they point to in the record for purposes of Gamble's behaviors say very little about their own behaviors. Plaintiff argues their failure to describe their own conduct in the reports violates Corrections Policies and Procedures. Perhaps so; but more importantly, their descriptions provide nothing for the Court to consider in challenge to Plaintiff's version of their conduct. The Information Reports and Disciplinary Write-Ups in the record, as noted and quoted in the fact section, refer to the officers' actions, and the force they employed, only by nondescript terms. For the first incident, officers Peavyhouse and Taylor offer that they "stopped with him"; "placed him on the wall"; "placed [him] in handcuffs"; "simultaneously ... restrained [him]" by Taylor and an officer Thomas "and cuffed by SGT Peavyhouse"; took him "off the wing"; "escorted [him] to the lower foyer"; he was "taken downstairs." (*See* text at pp. 2-3 herein, quoting Reports). For the second incident, officers Humfleet and Phillips offer that Gamble was "placed in the inside visiting room"; "removed [ ] from the area and placed [ ] back in the inside visitation room"; "remov[ed] [ ] from the table"; "placed on the floor face down"; and "place[d] [ ] in the floor in the visiting room." (*Id.* at pp. 3-4). This terminology does little to shed light on the nature and extent of force that the officers used. And Defendants provide no affidavits or anything else in their memorandum in support of their motion to otherwise inform the Court on the subject. Nor can the Court consider what the video footage and photo show as far as the seriousness of the incidents and possible gravity of interaction between the officers and Gamble and the potential injuries because they are not in the

record. Thus, it appears that Defendants do not now dispute, for purposes of their motion anyway, that they did use force with Plaintiff, although Gamble maintains that Defendants previously argued otherwise.[13]   So Defendants, by their silence or their minimal offerings with respect to the amount of force they used, accept for summary judgment purposes that the Court must view the officers' behavior in the light most favorable to Gamble and accept his version of events as true.[14]   *See Cordell,* 2014 WL 3455556, at *7. And, as discussed above, this would be so even were the disciplinary factual findings to be given preclusive effect.

Viewing Defendants' use of force in the two incidents in the light most favorable to Gamble reveals the following. As to the first incident, it occurred after Defendants Taylor and Peavyhouse conducted a shakedown of Gamble's dorm.  (R. 1-2, at 1).  Gamble's Complaint

---

[13]Gamble argues Defendants have been contradictory in their position about the force used against him, currently arguing "force was applied in a good faith effort to maintain or restore discipline" yet "since the opening phases of this suit, the defendants have been renouncing the use of any force at all, and denying that any force was ever applied or used."  (R. 23, at 5). Perhaps Gamble is referring to what Defendants previously argued in response to the prior summary judgment motion he filed. Defendants' Response argued there was no wrongdoing or excessive force on their part.

> In the appeals to the Warden (Exhs. A&B) the Plaintiff maintained his innocence and raised the issue of excessive force. The Warden found no wrong doing by the Defendants or any mistakes in the adjustment process thus the disciplinary proceedings were finalized. A total of six information reports (Exh. C) detailing the actions of the Plaintiff and Defendants on September 6, 2012 were filed and reviewed by various supervisors and no inappropriate behavior was noted in the reports. The accounts given in the disciplinary forms and the information reports detail the inappropriate behavior of an out-of-control inmate. The review by the Warden and by the supervisors of the Defendants show that each officer acted appropriately in the circumstances.

(R. 15, at 5). The Court's review of these documents does not align with Defendants' view, as no findings or conclusions about the officers' conduct or level of force is evident therein. In the Warden's denial of Gamble's appeal, he neither acknowledged wrongdoing on the part of the Defendant officers nor denied its possible existence. The focus was directed to whether to affirm the Adjustment Committee's finding that *Gamble's* conduct was a violation of Department disciplinary code. Neither the Adjustment Committee nor the Warden analyzed any specific details related to the *officers'* conduct and whether that conduct was an appropriately measured response to Gamble's reported behaviors. Nor, according to the administrative procedures set forth in this case record, will this question be considered by Training Center officials.   Gamble sought to present his challenges by way of Grievance; however, upon presentation the institutional response was the grievances were "non-grievable disciplinary charges."

> Although Defendants said they were incorporating their arguments from this Response in their current motion, this particular assertion--that by way of the Adjustment Process, the officers themselves had been affirmatively found not to have engaged in wrongdoing--is not a prior argument that Defendants have specifically highlighted or further elaborated on in their pending motion.

alleges that Defendants Taylor and Peavyhouse handcuffed him, took him to the ground, and drove their elbows and knees into his body. (R. 1, at 2). Gamble was then carried with his arms "twisted out of joint" and above his head down a flight of stairs, where he was slammed into a wall, picked up and slammed into tiles. (*Id*.). He claims he was again pinned to the tiles and Defendants Taylor and Peavyhouse again kneed him and drove their elbows into his body. (*Id.* at 2-3). Gamble asserts that he was still handcuffed at this time and began moving his head, but was "met by a palm thrust" to his head from Defendant Taylor, who then again slammed his head into tiles, knocking his tooth loose and giving him a contusion on his forehead. (*Id*. at 3). According to Gamble, he was not violent or threatening, never touched the prison officials, but was still "taken down with brute force." (*Id*. at 2). Gamble alleges he was then forced to walk barefoot across the yard to the segregation unit. (*Id*.).

Turning to the second alleged assault, Gamble asserts that he arrived at the segregation unit with a bloody mouth and swollen face and was dazed and dizzy. (R. 1, at 3). Gamble claims he was strip-searched and began complaining about the incident while being examined by medical staff. (*Id.*). He asserts that Defendant Humfleet then "ripped" him up from his seated position and "dragged" him twenty feet into a visitation area, where Defendant Humfleet and correctional officer Phillips, who is not named in this suit, slammed him into the wall and down to the tile while applying pressure to his wrists and forearms, twisting his arms, and driving their knees into his back and shoulders, making it difficult for him to breathe. (*Id.*). Gamble alleges

---

[14]Although Defendants argue that Gamble has produced "no probative evidence" to fight off summary judgment, Gamble's verified Complaint carries the same weight as an affidavit because he signed the Complaint under penalty of perjury. *See El Bey v. Roop,* 530 F.3d 407, 414 (6th Cir. 2009).

that Defendant Humfleet thereafter used his palm to grind Gamble's face and skull into the tiles, worsening his physical injuries. (*Id.*).

Based on Gamble's version of the incident, a reasonable jury could conclude that, in the first instance, Defendants Taylor and Peavyhouse used force maliciously and sadistically to cause harm, rather than in a good-faith effort to maintain or restore discipline. The Court's conclusion is guided by the Sixth Circuit's recent decision in *Cordell,* wherein the court denied the defendant's motion for summary judgment on an Eighth Amendment excessive force claim under circumstances factually similar to those presented in this case. As to the second incident, the purported justification for this use of force was that Gamble spit blood into a sink after he was instructed not to do so. Again, considering the threat Gamble posed while handcuffed and spitting blood into a sink, a reasonable jury could conclude that Defendant Humfleet's use of force was not in good faith, but was applied maliciously and sadistically to inflict harm upon Gamble.

Defendants, in an apparent attempt to acknowledge some version of Plaintiff's allegations as to the extent of force used, try to argue that "even if the Plaintiff was in fact 'slammed' down, this action would have been appropriate under the circumstances" (R. 20, at 5), apparently meaning circumstances of attempted head butting. But Plaintiff disputes the factual accuracy that he attempted to head butt the officers. Moreover, Defendants have not cited to any authorities that would suggest such force in response to a handcuffed prisoner's attempt to head butt an officer is reasonable and appropriate and cannot give rise to a question of wantonness or maliciousness as a matter of law.

And Defendant goes on to argue that "This reasoning holds equally true when the Plaintiff was spitting blood after being told not to do so." Again, Plaintiff disputes the factual accuracy that he was told not to spit blood into a sink before he did so. Moreover, Defendants certainly have not cited to any authorities that would suggest using such force of "slamming" an inmate down in response to a restrained inmate spitting blood from a mouth injury into a sink would be reasonable and appropriate force by officials that could not, as a matter of law, give rise to a jury question of whether officers acted in a wanton or malicious manner.

### 3.    Extent of injury

In *Cordell*, the court looked to the severity of plaintiff's injuries in considering whether excessive use of force was suggested, noting that the plaintiff suffered a laceration on his face that bled on the wall, the floor, and required stitches. *Cordell*, 2014 WL 3455556, at *7. After the alleged assault, the plaintiff immediately complained of head and neck pain.  *Id*. at *7.   Here, as a result of the assault, Gamble complained of being dazed and dizzy, his tooth was knocked loose, he suffered a contusion to his head, and he was bleeding to the extent that he was spitting blood from his mouth. (R. 1, at 2-3).   He complained of being violently thrown to the wall and floor in the second attack, worsening his injuries and having his breathing compromised. Defendants' own evidence submitted in support of their Motion for Summary Judgment confirms at least some of these injuries Gamble alleges he suffered.   (R. 15-3, at 5). The examining nurse reported that Gamble had an abrasion on his left forehead and a loose upper left back tooth, but she was unable to continue her examination because Gamble was moved to a visiting room. (*Id*.). As in *Cordell*, the extent of these injuries Gamble sustained demonstrates that Defendants used a considerable amount of force on him.

#### 4.     The perceived threat and efforts to temper severity of force

In considering the subjective component of whether defendant officials acted with a culpable state of mind, the extent of the threat and any efforts to temper the force used were also considered by the Sixth Circuit in *Cordell* and will also be briefly considered here.

In considering the threat the plaintiff posed at the time force was used against him, in *Cordell* the Circuit noted that the plaintiff had his arms handcuffed behind his back and was in a submission hold while being moved down a hallway. *Cordell,* 2014 WL 3455556, at *8. The court explained, "[i]t is hard to understand – even being deferential to [defendant's] split-second judgment – how a prisoner in such an incapacitated position would present a sufficient threat to justify the extreme use of force that [the plaintiff] accused Deputy McKinney of using." *Id.*   The same is true here. Gamble alleges he was handcuffed, his arms were twisted out of joint and above his head while he was picked up and carried off of the wing. (R. 1, at 2). The documents attached to Defendants' Motion for Summary Judgment confirm that Gamble was handcuffed at the time, although Taylor and Peavyhouse have inconsistent accounts of who placed Gamble in handcuffs.   (R. 15-3, at 1-2). As to the second incident, Gamble alleges he was restrained when he spit blood into a sink and was then forcibly removed from the seat and room. Defendant Humfleet offered no explanation of how he could have perceived this circumstance as threatening to him.

Finally, the Sixth Circuit considered the fact there was no evidence in the record that the prison official made an effort to moderate the force he used against the plaintiff.[15] *Cordell*, 2014

---

[15]In *Cordell*, there was evidence that the prison official was told to calm down and was in an agitated state. *Cordell*, 2014 WL 3455556, at *8.   Additionally, the record contained evidence that the official accepted a written warning for excessive use of force.   *Id.* The scarce record before the Court in this case does not contain evidence on the prison officials' demeanor during the relevant time period.

WL 3455556, at *8. This consideration arguably supports Gamble's position here, based upon the limited record before the Court, since Defendants have not offered any details to describe the actions they took that morning, let alone how they sought to temper any such actions in an effort to moderate the force they used against Gamble.

## C.     The Objective Component

Turning to the objective component of Gamble's excessive force claims, the inquiry is whether a reasonable jury could conclude that the pain inflicted by Defendants was sufficiently serious to offend contemporary standards of decency. *Cordell*, 2014 WL 3455556, at *10. The Supreme Court in *Hudson* explained, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Hudson*, 503 U.S. at 9. Continuing, the Court noted that "[t]his is true whether or not significant injury is evident." *Id*. Ultimately, the Court determined that given the extent of the plaintiff's injuries – bruises, swelling, loosened teeth, and a cracked dental plate – dismissing plaintiff's § 1983 claim would not be appropriate. *Id*.

Likewise, in *Cordell*, the Sixth Circuit determined that the plaintiff's injuries were sufficiently serious where he had a laceration on his forehead that was deep enough to leave blood on the wall, floor, and on his face. *Cordell,* 2014 WL 3455556, at *10-11. The Court discussed the record evidence of such injury being inflicted in comparison with the level of physical threat to officials by the plaintiff, including review of videotape evidence. Here, Gamble suffered from an abrasion to his head and a loosened tooth, and his injuries caused him to bleed from his mouth. This is accepting the facts as offered by Gamble, there being no evidence nor argument to the contrary offered by Defendants. Under *Hudson* and *Cordell*, a reasonable jury

could find that Plaintiff's injuries resulting from the use of force were sufficiently serious to satisfy the objective component of his Eighth Amendment claim.

## IV.     CONCLUSION AND ORDER

For the reasons stated above, a reasonable jury could find that the Defendant officers acted with malicious intent to injure Gamble, were the jury to believe Defendants were without appropriate justification for using the amount of force Gamble alleges they did when he presented no actual threat to the officers. The nature and extent of Gamble's injuries also suggest a substantial amount of force was used. And accepting Gamble's allegations that he was slammed to the wall and/or floor by Defendants while handcuffed, a reasonable jury could conclude that Gamble suffered severe pain that objectively violated contemporary norms of human dignity.

In adjudicating the prior motion for summary judgment filed in this case by Plaintiff, this Court concluded that Gamble's "own allegations establish that a question remains regarding whether the officers' conduct was an unprovoked assault or was occasioned by his own attempt to head butt officers Taylor and Peavyhouse." (R. 16, at 4). Although the Court is now addressing Defendants' motion, the conclusion is the same. Defendants' motion must also be denied because their own filings and attachments establish that questions remain regarding whether their conduct was an unprovoked assault or occasioned by Gamble's attempt to head butt officers Taylor and Peavyhouse and spit against order of officer Humfleet.   For, as this Court previously noted, the central inquiry in any claim of excessive force under the Eighth Amendment is "whether the force was applied in good faith to maintain or restore discipline or maliciously and sadistically

for the very purpose of causing harm." *Whitley,* 475 U.S. at 320-21. Because factual issues exist on this question, Defendants are not entitled to judgment as a matter of law.

For the reasons stated above, Defendant's Motion for Summary Judgment (R. 20) is hereby **DENIED.**

Dated September 30, 2014.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY